DAVID R. ZARO (BAR NO. 124334)
MICHAEL R. FARRELL (BAR NO. 173831)
PETER A. GRIFFIN (BAR NO. 306201)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
         mfarrell@allenmatkins.com
         pgriffin@allenmatkins.com

Attorneys for Plaintiff
THOMAS A. SEAMAN, Receiver

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS A. SEAMAN, Receiver,<br><br>            Plaintiff,<br><br>      v.<br><br>MARILYN THOMASSEN, an individual; MARILYN THOMASSEN & ASSOCIATES, P.C., a California professional corporation; M. THOMASSEN & ASSOCIATES, P.C., a California professional corporation; and AMERICAN IMMIGRATION LAW CENTER, a California professional corporation,<br><br>            Defendants. | Case No. 8:18-CV-00349<br><br>COMPLAINT FOR:<br><br>1. Breach of Escrow Agreements<br>2. Breach of Fiduciary Duty<br>3. Professional Negligence<br>4. Aiding and Abetting Securities Fraud |

Plaintiff Thomas A. Seaman ("Seaman" or the "Receiver"), the Court-appointed permanent equity receiver for PDC Capital Group, LLC ("PDC Capital"), Caffe Primo International, Inc. ("Caffe Primo") and their subsidiaries and affiliates ("Receivership Entities),[1] hereby brings the following complaint against the above-captioned defendants and, on behalf of the Receivership Entities, alleges as follows:

---

[1]  As used herein, "Receivership Entities" refers to the following specifically named entities:  PDC Capital Group, LLC; Caffe Primo International, Inc.; SAL Assisted Living, LP ("SAL LP"); SAL Carmichael, LP ("Carmichael LP"); SAL Citrus Heights, LP ("Citrus Heights LP"); SAL Kern Canyon, LP ("Kern Canyon LP"); SAL Phoenix,

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1367, in that this case arises out of and is related to the matters at issue in *Securities and Exchange Commission v. Emilio Francisco, et al.*, Case No. 16-cv-02257 CJC-DFM (the "SEC Action"), which is now pending in this Court.

2. Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions that give rise to the action occurred in this District.

## PARTIES

3. Pursuant to Orders entered in the SEC Action on January 5, 2017 and January 23, 2017 (together, the "Receivership Orders"), Seaman is the duly appointed permanent equity receiver for the Receivership Entities.

4. Certain Receivership Entities were formed to raise money from EB-5 Immigrant Investor Program applicants ("EB-5 Investors"). Among other things, the Receivership Orders authorize the Receiver to pursue all claims and causes of action of the Receivership Entities against third parties for the benefit of the EB-5 Investors and

---

LP ("Phoenix LP"); SAL Westgate, LP ("Westgate LP"); Summerplace at Sarasota, LP ("Sarasota LP"); Summerplace at Clearwater, LP ("Clearwater LP"); Summerplace at Correll Palms, LP ("Correll Palms LP"); TRC Tucson, LP ("Tucson LP"); Clear Currents West, LP ("CCW LP"); Caffe Primo Management, LP ("CPM LP"); Caffe Primo Management 102, LP through Caffe Primo Management 108, LP (collectively, "LPs"); and their subsidiaries and affiliates Summerplace Management, LLC; PDC Partners Management, Inc.; FDC Partners Management, Inc.; KPF Capital, LLC; FDC Capital Partners, LLC; MSL US Fund I, LLC; MPoint Land & Development, Inc.; Woodcrest Construction Management, Inc.; Professional Loading Service, LLLP; WDC Capital Group, LLC; WDC Capital Partners, LLC; KPF Investment Management, Inc.; Meridian Summerplace at Snug Harbor, LLC; Meridian Summerplace at Snug Harbor, LP; Summerplace at Correll Palms, LLC; Summerplace at Correll Palms, LP; Summerplace at Winter Haven, LLC; Summerplace at Winter Haven, LP; Summerplace at Sun City, LLC; Summerplace at Sun City, LP; Meridian at Sun City, LLC; Summerplace at Orlando-Summerfield, LLC; Summerplace at Orlando-Summerfield, LP; Summerplace at Kissimmee, LLC; Summerplace at Kissimmee, LP; Summerplace at Merced, LLC; Summerplace at Merced, LP; SAL-PDC, LLC; SLALMC, LLC; SAL Lincoln Village, IL; Lincoln Village IL, LLC; Lincoln Village IL, LP; Lincoln Village SNF, LLC; Lincoln Village SNF, LP; FCM Development Group, LLC; ADC Capital Group, LLC; NCDC Capital Partners, LLC; Summerplace at Bonney Lake MC, LLC; Summerplace at Bonney Lake MC, LP; Summerplace Management, LLC; Summerplace Development, LLC; Defiance Charters, LLC; and Red Sunshine Holdings, Ltd. (collectively, "Affiliates").

creditors of the Receivership Entities. The claims alleged in this action are assets of the Receivership Entities, are brought on their behalf, and fall within that provision of the Receivership Orders. This Court has ancillary and supplemental jurisdiction over these claims.

5. The Receivership Entities include Delaware entities PDC Capital and Caffe Primo, the LPs formed to issue securities, and the Affiliates associated with such LPs (the "LLCs"). The majority of the Receivership Entities operated from an office building located within this District at 250 Fischer Avenue, Costa Mesa, California. At all material times, the Receivership Entities' business plan involved developing and operating assisted living facilities and Caffe Primo restaurants. The principals of the Receivership Entities ("Principals") each owned all or part of them, either directly or indirectly, and/or exercised control over the Receivership Entities. The Principals include Emilio Francisco ("Francisco"), Robert Ferrante, Chris Fox, Eric Bronk, and Neil Richardson.

6. At all relevant times, Defendant Marilyn Thomassen ("Thomassen") was an individual licensed to practice law in California, and on information and belief, resided in or around Costa Mesa, California.

7. On information and belief, at all relevant times, Defendant Marilyn Thomassen & Associates, P.C. ("Marilyn TA") was a professional corporation organized under the laws of California and doing business in California.

8. On information and belief, at all relevant times, Defendant M. Thomassen & Associates, P.C. ("MTA") was a professional corporation organized under the laws of California and doing business in California.

9. On information and belief, at all relevant times, Defendant American Immigration Law Center ("AILC") was a professional corporation organized under the laws of California and doing business in California. Thomassen, Marilyn TA, MTA and AILC are sometimes collectively referred to herein as "Defendants".

10. Thomassen was a principal of each of the Defendants and shared an office building with multiple Receivership Entities in Costa Mesa, California. The acts and

omissions of Defendants and their principals, attorneys and employees described below occurred in this District or were directed to the Receivership Entities in this District.

11. On information and belief, the Receiver alleges that Defendants, at all relevant times, were and now are the agents, servants, employees, representatives, members, parent corporations, subsidiaries, owners and/or alter egos of each other and, in doing the things hereinafter alleged, were and are acting within the scope of their respective authority as agents, servants, employees, representatives, members, parent corporations, subsidiaries, owners and/or alter egos with the permission, consent and/or ratification of the remaining Defendants. Any allegation referring to a single defendant refers to all Defendants, jointly and severally. On information and belief, the Defendants shared an office in Costa Mesa, California, and the entity Defendants were owned by the same entities and/or individuals and shared employees such that employees of each of the Defendants performed duties for or on the behalf of the remaining Defendants.

## FACTUAL ALLEGATIONS

### The Fraudulent Scheme

12. From approximately September 2012 to September 2016, PDC Capital and certain of its Principals, including Francisco, made offerings in assisted living facilities and Caffe Primo restaurants through the LPs, primarily to investors in China attempting to qualify under the EB-5 Immigrant Investor Program administered by the U.S. Citizenship and Immigration Services ("USCIS"). In exchange for a capital contribution of $500,000 and payment of a $45,000 - $50,000 administration fee, an investor would receive a limited partnership interest and could petition USCIS for conditional permanent residency.

13. Through the offerings, the Receivership Entities raised approximately $76 million from 140 EB-5 Investors, consisting of approximately $70 million in capital contributions to purchase units in the LPs, and approximately $6 million in administration fees to pay expenses of the LPs until the projects were built.

14. In the offerings, PDC Capital and the respective offering LPs expressly represented that an EB-5 Investor's entire $500,000 capital contribution deposited in

escrow would be used to develop a specific project, and that only administration fees would be used to pay the expenses of the respective LP until the project was completed.

15. On information and belief and contrary to the representations to the EB-5 Investors, at the instruction of the Principals, millions of dollars of EB-5 Investors' funds in escrow accounts were diverted to and commingled in accounts controlled by PDC Capital.

16. On information and belief, PDC Capital, through certain of the Principals, including Francisco, engaged in a scheme to defraud the EB-5 Investors, and misrepresented to the EB-5 Investors that their capital contributions would be used solely for the project-specific purposes stated in the offering materials. On information and belief, PDC Capital, through certain of the Principals, including Francisco, commingled funds among different projects and otherwise diverted funds, contrary to such representations. On information and belief, at all relevant times, the Principals controlled the bank accounts, directly or indirectly, for all of the Receivership Entities as well as the escrow accounts, controlled and approved the terms of the various offerings, and controlled and benefitted personally from the misuse and misappropriation of funds. The Receivership Entities were dominated and controlled by the Principals at all times until the Receiver was appointed. On information and belief, the Principals concealed their wrongful conduct to prevent others from discovering their scheme by issuing offering documents that misrepresented and failed to disclose the wrongful activities, and by causing misleading information to be entered into the books and records of the Receivership Entities, among other things.

17. On information and belief, by engaging in this conduct, the LPs violated various federal securities fraud laws. As a result of these and other practices, the Principals caused millions of dollars to be diverted from targeted projects to unrelated projects and to pay the Principals' personal expenses, while the Receivership Entities have been left with significant liability exposure to EB-5 Investors and insufficient assets to meet their obligations.

**The Role of Defendants**

18. On information and belief, Thomassen and Francisco have had a longstanding business relationship, which includes partnering to form a law firm in 2010.

19. On information and belief, Defendants and many of the Receivership Entities shared an office building in Costa Mesa, California.

20. On information and belief, Defendants and the Receivership Entities also shared resources, including employees, who would perform work for both Defendants and Receivership Entities.

21. On information and belief, Defendants served as legal counsel for the Receivership Entities, and most of the EB-5 Investors, regarding immigration matters. The interests of the LPs, on the one hand, were to perform their obligations set forth in the offering documents, including the escrow agreements, to develop their projects in an efficient and cost-effective manner, and to utilize their assets to maximize value for the benefit of their owners and the EB-5 Investors. On information and belief, the interests of PDC Capital, the Principals and the Defendants, on the other hand, were to cause funds to be transferred without regard to the restrictions set forth in the applicable documents in order to benefit themselves. On information and belief, Defendants never disclosed the foregoing conflicts of interest to the applicable parties, and behaved as if their only clients were PDC Capital and the Principals, ignoring their independent duties to the LPs.

22. On information and belief, Defendants also served as escrow agents for the Receivership Entities' offerings and entered into the following escrow agreements:

(a) 3 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 101, L.P.

(b) 2 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 102, L.P.

(c) 3 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 103, L.P.

   (d) 4 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 104, L.P.

   (e) 4 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 105, L.P.

   (f) 4 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 106, L.P.

   (g) 3 escrow agreements between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 107, L.P.

   (h) 3 escrow agreements between an investor and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 108, L.P.

   (i) 1 escrow agreement between investors and M. Thomassen & Associates, P.C. for the benefit of Caffe Primo Management 110, L.P.

   (j) 4 escrow agreements between investors, M. Thomassen & Associates, P.C. and Clear Currents West, L.P.

   (k) 12 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Assisted Living, L.P.

   (l) 10 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Carmichael, L.P.

   (m) 14 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Citrus Heights, L.P.

   (n) 10 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Kern Canyon, L.P.

   (o) 19 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Phoenix, L.P.

   (p) 12 escrow agreements between investors, M. Thomassen & Associates, P.C. and SAL Westgate, L.P.

   (q) 1 escrow agreement between an investor, American Immigration Law Center and Summerplace at Clearwater, L.P.

(r) 3 escrow agreements between investors, American Immigration Law Center and Summerplace at Correll Palms, L.P.

(s) 1 escrow agreement between an investor, American Immigration Law Center and Summerplace at Orlando, L.P.

(t) 28 escrow agreements between investors, American Immigration Law Center and Summerplace at Sarasota, L.P.

(u) 1 escrow agreement between an investor, American Immigration Law Center and Summerplace at Sun City, L.P.

(v) 15 escrow agreements between investors, M. Thomassen & Associates, P.C. and TRC Tuscon, L.P.

23. Pursuant to the aforementioned escrow agreements, each of the EB-5 Investors delivered to Defendants a capital contribution of approximately $500,000 in addition to an administration fee.

24. On information and belief, Defendants maintained escrow accounts at various banks over the applicable time period for the purpose of transferring funds to the separate LPs pursuant to the escrow agreements.

25. Pursuant to the escrow agreements and other offering documents, each EB-5 Investor's capital contribution was to be transferred by Defendants to a specific LP's bank account and would be used to develop a specific project. Only an EB-5 Investor's administration fees would be available to pay the expenses of the respective LP until the project was completed. The escrow agreements for all LPs other than SAL Carmichael, LP provided for the release of investor capital contribution funds to the applicable LP once the investor was accepted and approved by the partnership. As to SAL Carmichael, LP, eighty percent (80%) of an investor's capital contribution funds was to be released upon approval of the first investor's I-526 petition, and the remaining funds were to be released when the last investor's petition was approved.

26. On information and belief, Defendants breached certain escrow agreements by diverting the EB-5 Investors' capital contributions to accounts other than those specified

in the escrow agreements and commingling them with the funds of investors in unrelated projects. On information and belief, for the escrow agreements identified in paragraph 21 above, the conditions for release of funds by Defendants to the designated LP were satisfied or, as to SAL Carmichael, funds were transferred by Defendants prior to approval of the last investor's petition. Nevertheless, some or all of the EB-5 Investors' capital contribution was transferred to an account of an entity other than the designated LP, resulting in the following:

(a) The amount of investor funds distributed by Defendants to SAL Carmichael, L.P. or its applicable project LLC was approximately $3,100,000.00 less than the amount required under the escrow agreements or otherwise distributed by Defendants;

(b) The amount of investor funds distributed by Defendants to SAL Citrus Heights, L.P. or its applicable project LLC was approximately $3,100,000.00 less than the amount required under the escrow agreements;

(c) The amount of investor funds distributed by Defendants to SAL Phoenix, L.P. or its applicable project LLC was approximately $2,700,000.00 less than the amount required under the escrow agreements;

(d) The amount of investor funds distributed by Defendants to SAL Westgate, L.P. or its applicable project LLC was approximately $1,400,000.00 less than the amount required under the escrow agreements;

(e) The amount of investor funds distributed by Defendants to Summerplace at Sarasota, L.P. or its applicable project LLC was approximately $9,800,000.00 less than the amount required under the escrow agreements; and

(f) The amount of investor funds distributed by Defendants to TRC Tucson, L.P. or its applicable project LLC was approximately $2,900,000.00 less than the amount required under the escrow agreements.

27. On information and belief, Defendants, opened new accounts for certain projects in a manner designed to give the appearance of legitimate escrow accounts in the eyes of EB-5 Investors, but which in fact allowed the Defendants to assist the Principals

and PDC Capital to divert funds in violation of the offering documents while avoiding bank scrutiny. On information and belief, when certain offerings were made through PDC Capital, Defendants opened two accounts : one trust account into which the EB-5 Investors deposited funds, and the other a regular account in Defendants' name at a different bank into which the EB-5 Investor funds would be immediately swept. Funds were then transferred by Defendants as instructed by the Principals. On information and belief, this system was designed to avoid transfer restrictions on the trust account and/or fraud detection efforts. No disclosures were made to EB-5 Investors identifying this account management system implemented by Defendants.

28. On information and belief, Defendants diverted some or all of the capital contributions at the instruction of the Principals. On information and belief, Francisco, or another Principal with Francisco's approval, instructed employees of Defendants to transfer money from escrow accounts to other accounts, including accounts controlled by PDC Capital. On information and belief, Thomassen created and maintained a system utilized by Defendants whereby any of the Principals, subject to Francisco's approval, was authorized to have Defendants transfer funds from, between and among the various accounts Defendants administered, without question. Thomassen was aware of each transfer, as she would receive a confirmation email from the applicable bank regarding each transfer.

29. On information and belief, Defendants were aware that PDC Capital, through Francisco and other Principals, engaged in a scheme to defraud the EB-5 Investors by, among other things, misrepresenting to the EB-5 Investors that their capital contributions would be used for the designated purposes stated in the offering materials. On information and belief, Defendants assisted with this scheme to defraud by actively diverting funds at the Principals' instruction and commingling funds among different projects, contrary to representations in the offering materials.

30. On information and belief, Defendants were aware that by engaging in this conduct, the LPs likely violated various federal securities fraud laws.

31. During their legal work for the Receivership Entities, Defendants knew or through the exercise of reasonable care should have known the following

    (a) that the various Receivership Entities had conflicting interests, as described above;

    (b) that the use of EB-5 Investor funds was restricted pursuant to the terms of the escrow agreements and other offering documents; and

    (c) that the transfer of funds described above were in violation of the escrow agreements and other offering documents.

### The Receiver's Discovery of These Claims

32. The Receivership Orders authorized and directed the Receiver to undertake a great many activities in addition to investigating and pursuing third-party claims such as those alleged in this Complaint. Among other things, the Receiver was directed to: take possession and control of the records and assets of the Receivership Entities, which were located throughout the United States; take control of all bank accounts holding assets of the Receivership Entities, investigate and account for the assets of the Receivership Entities; take all actions necessary to preserve the assets of the Receivership Entities; and gain access to and preserve all electronic information maintained by the Receivership Entities, among other things.

33. A number of these tasks were of an emergency nature, especially the need to locate and preserve the assets of the Receivership Entities. Almost all of the projects in development were facing severe liquidity issues, and a number of the Caffe Primo projects were in danger of being evicted from their properties. The Receiver encountered some level of resistance to his initial efforts to obtain information from the Principals, who disputed the effect of the Receivership Orders on specific Affiliates, thereby delaying the Receiver's investigation and analysis. Control of these Affiliates and access to some of their books and records did not occur until April 17, 2017. Even then, a substantial amount of information, including e-mails and computer records of certain Principals and staff, were never turned over to or recovered by the Receiver. The need to address

emergent issues kept the Receiver from beginning an immediate investigation of third party claims against agents of the Receivership Entities, and the delay in turnover of information concerning certain Affiliates prevented the Receiver from obtaining an understanding of the Principals' scheme and Defendants' role in that scheme until the summer of 2017. The Receiver was reasonably diligent in his investigation of possible claims against Defendants in light of the facts and circumstances detailed above.

## FIRST CLAIM FOR RELIEF

**(For Breach of Escrow Agreements)**

34. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 33, inclusive, set forth above.

35. Receivership Entities and Defendants entered into the escrow agreements identified in paragraph 21 above, which required Defendants to release the capital contribution funds received from each EB-5 Investor only to the account of a specified Receivership Entity.

36. The applicable Receivership Entities did all, or substantially all, of the significant things that the escrow agreements required them to do.

37. On information and belief, with respect to the LP entities identified in paragraphs 27 (a)-(f) above, Defendants breached the applicable escrow agreements by transferring funds received from each EB-5 Investor to accounts other than the account of the specified Receivership Entity, and instead diverted some or all of the funds to other accounts, including accounts controlled by PDC Capital.

38. As a direct and proximate result of Defendants' breaches, the applicable Receivership Entities have been damaged in an aggregate amount of not less than $23,000,000.00.

## SECOND CLAIM FOR RELIEF

**(For Breach of Fiduciary Duty)**

39. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 38, inclusive, set forth above.

Allen Matkins Leck Gamble
Mallory & Natsis LLP

1100677.04/LA                                  -12-

40. Defendants acted as escrow agents for certain Receivership Entities as set forth in paragraph 21 above.

41. As the applicable Receivership Entities' escrow agents, Defendants owed such entities a fiduciary duty to comply strictly with the parties' written agreements and to exercise reasonable skill and diligence in carrying out the escrow agreements.

42. On information and belief, Defendants breached their fiduciary duties to the Receivership Entities by, among other things:

(a) Failing to comply strictly with the escrow agreements which required Defendants to release one hundred percent (100%) of the funds received from each EB-5 Investor to the account of a specified Receivership Entity;

(b) Failing to exercise reasonable skill and diligence in carrying out the escrow instructions;

(c) Participating in, furthering and aiding and abetting the Principals in their diversions of EB-5 Investors' funds by, among other things, following instructions of the Principals that were contrary to the escrow agreements.

43. Defendants' breaches of their fiduciary duty were fraudulent and made in furtherance of a scheme to violate various federal securities laws.

44. As a direct and proximate result of Defendants' breaches of fiduciary duty, the Receivership Entities were harmed financially in an amount to be proven at trial, but not less than $23,000,000.00.

45. Defendants' breaches of fiduciary duty were and are causes in fact and substantial causes of the Receivership Entities' financial harm.

### THIRD CLAIM FOR RELIEF
### (Professional Negligence)

46. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 45, inclusive, set forth above.

47. On information and belief, attorney-client relationships existed between Defendants and the Receivership Entities.

48. As the Receivership Entities' attorneys, Defendants owed the Receivership Entities a duty to use the skill and care that a reasonably careful attorney would have used in similar circumstances.

49. On information and belief, Defendants failed to exercise reasonable care and skill, and negligently performed their professional duties to the Receivership Entities by, among other things, participating in, counseling, furthering, and aiding and abetting the improper transfer of investor funds as described in the paragraphs above, negligently failing to consider, investigate the existence of, disclose, or obtain proper waivers of potential and actual conflicts of interests, negligently failing to consider, investigate, and advise the Receivership Entities concerning the potential legal ramifications of such improper fund transfers, and failing to consider, investigate and timely advise the Receivership Entities that the conduct described herein could constitute securities fraud, and the legal ramifications thereof.

50. Defendants' actions and failures to act constitute negligence as they demonstrated Defendants' lack of any care or an extreme departure from what a reasonably careful attorney would do in the same situation to prevent harm to the Receivership Entities.

51. Defendants' negligent actions and failures to act were and are causes in fact and substantial causes of the Receivership Entities' financial harm and increased exposure to liability. But for Defendants' actions in participating in the diversion of funds and failures to act described herein, including the failure to warn the Receivership Entities concerning their legal exposure, the improper transfers would not have occurred and Receivership Defendants would not have suffered such damages.

52. As a direct and proximate result of Defendants' negligence and breaches of fiduciary duty, the Receivership Entities were harmed financially in an amount to be proven at trial, but not less than $23,000,000.00.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting Securities Fraud)

53. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 52, inclusive, set forth above.

54. On information and belief, at all times relevant, Francisco was CEO and Chairman of PDC Capital and Caffe Primo and, in conjunction with the other Principals, controlled all of the Receivership Entities. The Principals each owed a fiduciary duty to act in the best interests of the Receivership Entities.

55. On information and belief, the Principals, with Defendants' substantial assistance, engaged in a scheme to defraud the EB-5 Investors by making false statements concerning limitations on the use of their investment funds, as well as the manner in which their investments funds would be used, including engaging in transactions designed to obscure the diversion of funds, and to enrich themselves at the expense of the EB-5 Investors.

56. On information and belief, at all relevant times, the Principals acted with scienter to divert funds in violation of numerous offering and escrow documents to enrich themselves at the expense of the defrauded EB-5 Investors. On information and belief, the Principals knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

57. On information and belief, the Principals, aided by Defendants, caused the transfer of millions of dollars to accounts other than those designated in applicable escrow agreements in order to fund unrelated projects as well as business operating expenses and their personal expenses.

58. When the foregoing transfers were made, Defendants knew or should have known that they (a) stripped the applicable Receivership Entities of needed funds, (b) rendered such entities insolvent or were made while they were insolvent, (c), left such entities without adequate working capital, (d) were fraudulent transfers, and (e) constituted

breaches by the Principals of their fiduciary duties to the Receivership Entities. On information and belief, at all relevant times Defendants knew the transfers would unjustly enrich themselves and unrelated projects to the detriment of the applicable Receivership Entities and their creditors.

59. The Principals breached their respective fiduciary duties when they engaged in the actions described in the paragraphs above.

60. On information and belief, Defendants aided and abetted the Principals in breaching their fiduciary duties to the applicable Receivership Entities by, among other things, furthering, assisting and executing the diversion of EB-5 Investors' investment funds to improper accounts, contrary to the representations made to the EB-5 Investors and the terms of applicable escrow agreements.

61. The Principals' diversion of millions of dollars of EB-5 Investors' funds, aided and abetted by Defendants, was a direct, substantial and proximate cause of the applicable Receivership Entities' loss of over $23,000,000.00 as well as exposure to substantial liability to the EB-5 Investors and creditors.

62. As a direct, substantial and proximate cause of Defendants' aiding and abetting and participation in Principals' breaches of fiduciary duty, Receivership Entities suffered losses in excess of $23,000,000.00 and suffered consequential damages including, but not limited to, insolvency, receivership, indebtedness to creditors and exposure to liability to investors, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Receiver prays for judgment against Defendants, and each of them, as follows:

**On the First Cause of Action:**

1. For damages in an amount according to proof at trial but not less than $23,000,000.00;

2. For prejudgment interest as allowed by law;

3. For costs of suit herein incurred; and

4. For such other and further relief as the Court may deem just and proper.

**On the Second Cause of Action:**

1. For damages in an amount according to proof at trial, but not less than $23,000,000.00;

2. For prejudgment interest as allowed by law;

3. For costs of suit herein incurred; and

4. For such other and further relief as the Court may deem just and proper.

**On the Third Cause of Action:**

1. For damages in an amount according to proof at trial, but not less than $23,000,000.00;

2. For prejudgment interest as allowed by law;

3. For costs of suit herein incurred;

4. For disgorgement of legal fees paid; and

5. For such other and further relief as the Court may deem just and proper.

**On the Fourth Cause of Action:**

1. For damages in an amount according to proof at trial;

2. For prejudgment interest as allowed by law;

3. For costs of suit herein incurred;

4. For disgorgement of escrow and legal fees paid; and

5. For such other and further relief as the Court may deem just and proper.

Dated: March 1, 2018

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO
MICHAEL R. FARRELL
PETER A. GRIFFIN

By: */s/ Michael R. Farrell*
MICHAEL R. FARRELL
Attorneys for Plaintiff
THOMAS A. SEAMAN, Receiver